UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:15-CV-00146

MARIO LUIS GONZALEZ PLIEGO,                                    Petitioner

v.

AMANDA LEIGH HAYES,                                           Respondent


**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION**

This is a Petition for Return of Child pursuant to 42 U.S.C. § 11601, *et seq*., the International Child Abduction Remedies Act, which implements the Hague Convention on the Civil Aspects of International Child Abduction. This Court has original jurisdiction under 42 U.S.C. § 11603(a).

This matter is before the court on Petitioner Mario Luis Gonzalez Pliego's Second Petition for Return of Child Under the International Child Abduction Remedies Act ("ICARA") and the Hague Convention. (Docket No. 1).  The Court held evidentiary hearings on July 9, 2015 and July 19, 2015. The Court now issues the following written Findings of Fact and Conclusions of Law in support of its resolution of this matter.

**FINDINGS OF FACT AND PROCEDURAL HISTORY[1]**

---

[1] The Court considered the various filings of the parties, as well as the testimony of Amanda Hayes, Mario Gonzales Pliego, Karen Akinci, Mercedes Pliego Viyuela, Madeline Morris, Javier Diez-Hochlietner, and Shebnem Akipek. The Court will discuss the testimony of Amanda Hayes and Mario Gonzales Pliego throughout its opinion, and will discuss the other witnesses separately.

Hayes also called one of her Turkish attorneys, Erkin Gocmen, as a witness during the first hearing.  Unfortunately, the Court found his testimony to be too difficult to understand due to the language barrier and lack of a translator and was not able to consider it, except to the extent that portions of his testimony was comprehensible.

Amanda Leigh Hayes ("Hayes") and Mario Luis Gonzalez Pliego ("Pliego") are the parents of a minor child who is the subject of this litigation.  This is Pliego's second Petition pursuant to the Hague Convention, and the implementing legislation in the United States, ICARA, set forth in 42 U.S.C. § 11601, *et seq*.

The Court will briefly review the facts of the first Hague Petition.  In 2014, the family was living in Ankara, Turkey.  On April 26, 2014, Hayes traveled with the child to Kentucky, where she filed for divorce and custody in Christian County, Kentucky and informed Pliego that she would not be returning to Turkey and intended to keep the child with her in the United States.  After significant litigation, the Court held an evidentiary hearing on December 18 and 19, 2014.  The Court issued its Findings of Fact, Conclusions of Law, and Opinion on January 21, 2015, finding that Pliego had met the requirements of his prima facie case under ICARA, and that Hayes had not satisfied her burden to prove any affirmative defenses.  *Pliego v. Hayes*, 2015 WL 269207 (W.D.  Ky. Jan, 21, 2015) (hereinafter *Pliego I*).  This Court held that the child's habitual residence was Turkey, and that the child was to be returned to Turkey for the resolution of all custody matters.  *Id.*

<u>Events relating to the second Petition</u>

After more litigation in this Court to effectuate the transfer of the child from Hayes to Pliego, Pliego returned with the child to Ankara, Turkey on February 6, 2015, where they resumed their routines.  The child was re-enrolled in the Ankara English pre-school and visited his regular pediatrician. (Docket No. 1, p. 26).  Pliego filed this Court's opinion with the Ankara 11th Family Court, requesting custody of the child.

<u>Litigation in Turkey</u>

Hayes and her mother, Judy Hall, also traveled to Turkey, arriving there before Pliego and the child.  When she arrived, Hayes filed two lawsuits in Istanbul on January 30, 2015.  In the 5th Family Court of Istanbul she requested temporary custody and an exit ban for the child, and in the 7th Family Court of Istanbul she filed for divorce.  The 5th Family Court of Istanbul granted an exit ban for the child.  As part of Hayes's divorce action in the 7th Family Court of Istanbul, she was granted *ex parte* temporary custody in an order dated February 13, 2015. Around February 12, 2015, Hayes also filed for custody of the child in the 8th Family Court of Ankara.  On February 18, 2015, the 8th Family Court of Ankara issued an exit ban for the child as well, and reserved further ruling.

On February 19, 2015, without advance notice to Pliego, Turkish police executed the *ex parte* order from the 7th Family Court of Istanbul giving Hayes temporary custody of the child. The parties dispute how the custody order was executed.  According to Pliego:

> That evening, about eight armed Turkish police officers -- accompanied by Ms. Hayes, Ms. Hayes' two Turkish attorneys, a social worker, and a judicial agent-- violently broke down the door to Mr. Pliego's home and forcibly took the child from his father. . . . They began pushing and with the force of 8 officers, Ms. Hayes' lawyer, and Ms. Hayes herself, the door broke and they rushed into the home, found the child, and left.

(Docket No. 3).  Both Hayes, in her testimony, and the Turkish Police Report contradict this account, stating that no door was forced.  (Docket No. 18-2).  Pliego testified that the Turkish Police Report was inaccurate, and that the police apologized in a note for their actions that evening.

Hayes testified that when the child was returned to her, he was extremely clingy, ran and hid when the doorbell rang, would yell when he could not see her, started wetting the bed, kept his head down while eating dinner, and had nightmares.

<u>Pliego's diplomatic immunity in Turkey</u>

After the Turkish police took the child, the Spanish government raised the issue of Pliego's diplomatic immunity in the Istanbul court "as a reaction to their Spanish government foreign worker's home being invaded by the Turkish police, without notice, and his child being taken from him in the middle of the night with such force." (Docket No. 3).

Pliego moved to set aside the *ex parte* temporary order issued by the Istanbul 7th Family Court on March 2, 2015. This request was granted in an order on March 5, 2015. The order stated that the Turkish court had no jurisdiction over this issue due to Pliego's diplomatic immunity and ordered the child returned to the father (thus preserving the status quo that existed when Pliego entered Turkey with the child). Hayes testified that she believed this to be a dismissal of the case, and believed that it would also end the exit ban that she had requested for the child.

In regards to his diplomatic immunity, Pliego testified that he requested a waiver of his immunity so that he could litigate the custody issue in Turkey. He stated that once waived, his immunity cannot be re-asserted. Pliego filed several documents with the Court in support of his claim that he waived immunity. Because this issue constitutes a large portion of the parties' arguments relating to this Petition, the Court will review the exhibits on this issue in detail.

Pliego filed a document dated April 6, 2015 where he requested to merge the Istanbul and Ankara cases to proceed before the 8th Family Court of Ankara. This document states that:

> The plaintiff, Mario Gonzalez Pliego, diplomat, First Secretary of the Embassy of Spain in Ankara has immunity from jurisdiction under Articles 29 'and 36 of the Vienna Convention of 1961, of which Turkey is a party though the Law number 3042, Nevertheless once this case merges with the file number "2015/232" of the 8th Family Court of Ankara it could be an obstacle to judge the plaintiff and for this reason, only for this custody case and pursuant to article 32 of the Vienna Convention, his immunity has been waived by the Spanish State.

(Docket No. 22-2).  Pliego also submitted a letter written to the Ankara Family Court.  In part, it

states:

> In this case, in accordance with articles 32.1 and 32,2 of the Vienna Convention
> on Diplomatic Relations, the waiver of my diplomatic immunity of jurisdiction
> has been authorised by the Spanish State, final holder of the immunity of the
> diplomatic agent, through Verbal Note number 135/15 dated on the 4th of May
> 2015 directed to the Ministry of Foreign Affairs of Turkey;
>
> However, this waiver of the diplomatic immunity of jurisdiction is only
> authorized by the Spanish State, final holder of the immunity of the diplomatic
> agent, for the custody issue of my son and, in accordance with the restrictive
> terms and prevalent interpretation of the Vienna Convention, it does not apply to
> any other concurrent procedure or with regards to other issues of administrave,
> civil or criminal nature connected to it, namely the actions for divorce and for the
> false allegations of maltreatment, originally pursued by Ms. Hayes before the 7th
> and 5th Family Court of Istanbul which have already been closed by the
> respective judges . . .

(Docket No. 22-3).

Pliego submitted two letters from Rafael Mendivil Peydro, Ambassador of Spain to

Turkey, to Judge Thomas Russell.  The first, dated July 1, 2015, states that the waiver of Pliego's

diplomatic immunity has been authorized by the Spanish State.  He specifies that "[t]he waiver is

only "for the custody case of [Pliego's] son, pending in Turkey, and in accordance with the

restrictive terms and prevalent interpretation of the Vienna Convention. This waiver does not

apply to any other procedure or with regards to other issues of administrative, civil or criminal

nature connected to it . . . .," however it notes that Pliego cannot invoke immunity in respect to

any counterclaim directly connected with the principal claim. (Docket No. 22-6).

A second letter from Peydro to Judge Thomas Russell, dated July 2, 2015, specifies that

immunity was communicated through "Verbal Note number 135/15 dated on the 4th of May

2015 for the immunity of jurisdiction, and Verbal Note number 204/15 dated on the 2nd of July

2015 for the immunity of execution, which where was addressed to the Ministry of Foreign

Affairs of Turkey." (Docket No. 22-6). It also states that the waiver of "immunity of jurisdiction and execution is effective from that moment that those verbal notes where sent." *Id.*

Pliego submitted a letter to the 11th Ankara Family Court, dated July 2, 2015, where he echoes the sentiments regarding when his immunity was waived. He notes again that the immunity "does not apply to any other procedure or with regards to other issues of administrative, civil or criminal nature connected to it . . . ." (Docket No. 22-7).

Finally, Pliego submitted a third Verbal Note, #225/15, dated July 19, 2015. This Note was from the Embassy of the Kingdom of Spain directed to the Ministry of Foreign Affairs of the Republic of Turkey. It clarifies that Pliego's diplomatic immunity is waived in both the Ankara 8th Family Court and 11th Family Courts, noting that the waiver of the immunity of jurisdiction and execution in the 11th Family Court was omitted by mistake.

<u>Attempted return of the child</u>

As the Istanbul 7th Family Court on March 5, 2015 ordered the child returned to his father (a return to the status quo as it did not have jurisdiction), on March 6, 2015, Pliego attempted to enforce the Turkish court's last order. However, Hayes and the child were not at the address provided to the court and Turkish police could not find them. Pliego was notified that around March 12, 2015, Hayes traveled to Adana, Turkey, and filed an application for a "one signature" passport for the child, meaning that it did not require both parents' signatures as normally required. Further, the Turkish police notified Pliego that Hayes attempted to exit Turkey into the country of Georgia but was prevented from doing so by the exit ban in place for the child. Pliego testified that he was unsure where Hayes and the child were during this time period, and that their whereabouts only came to light through Hayes's testimony at the first evidentiary hearing.

At the July 9th hearing, Hayes testified that after receiving the child, she and the child moved through a series of "safe houses" at the advice of her counsel, for approximately a month. Hayes testified that "safe houses" were private residences for victims of domestic violence.  It sometimes took her and the child ten hours of driving to reach the next "safe house."  She did not always know where the houses were located.  She testified to attempting to cross the Turkish-Georgia border with the child but stated that she was stopped by the exit ban that was still in place.  Finally, she testified to leaving Turkey with the child via a boat and traveling over the course of at least two days in the Mediterranean Sea, docking in the Greek Islands, to Albania. From Albania, she flew with the child back to the United States.  Pliego testified that the hearing was the first time he heard about how Hayes and the child were able to leave Turkey in spite of the exit ban to enter the United States.  He testified that he was very concerned and upset about the safety of her travel through, and out of, Turkey with the child.

Hayes's counsel wrote:

At this point in time the Ankara custody case was still pending. However, it was the opinion and advise of Respondent's Turkish counsel that since the Istanbul court had refused to exercise jurisdiction, an identical result would occur in the Ankara court (unless immunity was waived, which had not occurred) once Ankara addressed the case.

(Docket No. 18).  Hayes stated that she believed her efforts to obtain relief in Turkey, as directed by the first Hague Order, had failed or would fail, leaving her without a Turkish remedy.  She also stated that she was worried that Pliego would remove the child to Spain, which she alleges was his goal.  Hayes notes that Pliego did file a lawsuit in Spain.  (Docket No. 3-7).  She submitted Pliego's Turkish court filings that requested to merge the Istanbul and Ankara cases. The filing states, "On the other hand, on the 18 March 2015 the Court of First Instance number 18 of Barcelona through its Decision 63/2015 decided to give the custody of the common child

the plaintiff Mario. (Annex 14). Once this Decision becomes definite its enforcement and recognition in Turkey will be requested."  (Docket No. 3-7).  Pliego testified that he filed for divorce in Spain, and that procedurally he was also required to file for custody in the same lawsuit, but that he fully intended to and intends to litigate the issue of custody in Turkey.

<u>The child's return to the United States</u>

Hayes reentered the United States with the child on April 7 or 8, 2015.  Pliego testified that he did not know where the mother and child were.  Hayes testified that Pliego was permitted Skype access to the child, and that during one of those sessions the child told Pliego where they were.  Further, she stated that that Pliego would have known where they were by the familiar surroundings of her aunt and grandmother's homes in Hopkinsville, visible on the screen through Skype.  After her return, Hayes resumed litigation about the child in state court in Christian County on an *ex parte* basis.  Hayes also testified that Pliego would have received notice of this through his Kentucky counsel.

Pliego filed his second Petition under the Hague Convention in this Court on June 19, 2015, and also filed an *ex parte* motion for a temporary restraining order ("TRO") the same day.  On June 25, 2015, the Court granted the TRO in part.  That order prohibited Hayes from removing the child from this Court's jurisdiction, confiscated travel documents for the child from Hayes, ordered possession of the child restored to Pliego with 48 hours of service on Hayes, and set a date for an expedited final hearing.  Hayes voluntarily submitted to service by the U.S. Marshals on June 26, 2015.  The Court held a hearing regarding the TRO on June 29, 2015.  After hearing testimony, the Court ordered that the child stay in the possession of his father in Nashville, TN, pending the Court's hearing scheduled for July 9, 2015.

During the week between the hearings, the child stayed with his father and grandmother in a rented home in Nashville, TN.  Hayes was allowed visitation with the child at a museum in Nashville.  During her first visit, she noticed multiple bruises on the child and took photographs of his face, legs, arms/hands, and buttocks.  (Docket No. 36-40).  At the July 9th hearing, she testified that the bruises did not look like they came from mosquito bites.  Further, Hayes testified that when she asked the child if he had a booboo, he tried to hide and turned away.  She stated that she was not able to take the child to the doctor because the terms of her visitation were that she had to remain in the museum with the child.  She testified that on her second visit, July 7, 2015, the child had additional bruises on his calves, hand, and buttocks.  She took the photos to the child's pediatrician, Dr. Campbell, in Hopkinsville.  The doctor was not able to reach any conclusions without seeing the child, but he did call Social Services to report the photographs.

Pliego testified that the bruises were from mosquito bites, and that he did not bruise or hurt his son in any way.  He also testified that he would be willing to follow any undertakings that the Court should order to ensure litigation of the case in Turkey.

<u>Mercedes Pliego Viyuela</u>

Ms. Pliego Viyuela, Pliego's mother and a retired physician, testified that what appeared to be bruises were the remains of mosquito bites that the child sustained while playing in the backyard with his father.  She stated that the child received many bites, and one was on his face on the cheek.  She put cream on the bites but the child woke up with a swollen eye, and she and Pliego took him to the doctor that morning, July 1.  At the doctor, he received prescriptions of a steroid and an antibiotic.  Pliego submitted these as exhibits.

## Karen Akinci

Hayes called Karen Akinci, a legal consultant to individuals and companies in Turkey. Akinci has a legal degree but is not barred or certified to practice law, and helps lawyers to manage their cases.  In her affidavit, she stated that she makes no claim to legal training or qualifications in Turkish law.  Attorneys for the Petitioner objected to much of Akinci's testimony and argued that she was not qualified as an expert under Rule 702.  The Court had concerns as to Akinci's qualifications and experience to give some opinions.  The Court indicated that Respondent could ask opinion questions, and that the Court would give those opinions the weight it felt they deserved based on Akinci's qualifications, experience, and expertise.  Further, the Court noted that much of her testimony was hearsay about what Hayes's attorneys told Akinci.  However, the Court does take note of her testimony that, as a result of her personal experience overseeing cases, custody cases can take a long time, even lasting 3-5 years in Turkey.  She also stated that the upcoming holiday period in Turkey will delay cases more. The Court considered all opinions rendered by Akinci.

## The Court's second evidentiary hearing

The Court held a second hearing in this case on Sunday, July 19 specifically to hear expert testimony regarding the meaning of and limitations on Pliego's diplomatic immunity. That morning, counsel for the Petitioner provided Respondent's counsel and the Court a Verbal Note which clarified the preceding Notes.  It was dated July 19, 2015 and was from the Embassy of the Kingdom of Spain directed to the Ministry of Foreign Affairs of the Republic of Turkey. The Note clarifies that Pliego's diplomatic immunity is waived in both the Ankara 8th Family Court and 11th Family Courts, noting that the waiver of the immunity of jurisdiction and execution in the 11th Family Court was omitted by mistake.

<u>Professor Melody Morris</u>

Hayes called Duke University School of Law Professor Melody Morris, who was accepted as an expert in immunities and jurisdiction under international law without objection. Morris explained that by initiating a lawsuit, a diplomat automatically relinquishes immunity regarding any counterclaim.  However, initiating a lawsuit does not waive the immunity of execution, meaning that the opposing party could not enforce an order of the court.  Morris testified that the first Verbal Note dated May 4 actually accomplished nothing, because it only mentioned immunity of jurisdiction (which was waived with Pliego field his lawsuit seeking custody).  She testified that the Note dated July 2 waived immunity of both jurisdiction and execution, but only for the case that had been dismissed already in 8th Family Court in Ankara.

Morris also had the opportunity to examine the July 19th Note prior to her testimony. She testified that it does waive jurisdiction and execution for both cases, including the one pending in the 11th Family Court in Ankara, but noted that she was not sure if it had been transmitted to the Turkish Court.  Morris testified that Pliego is still immune for collateral issues, such as a separate domestic violence action.  Morris noted that Pliego was not immune from the contempt powers of this Court, however in order to enforce them, this Court would have to rely on Turkish police, who would be barred from cooperating.

Further, Morris testified as to issues that remain even with the waiver in place. Under the Vienna Convention, a diplomat has inviolability as to his person, his residence, and his papers and effects, which means that he cannot be arrested or detained, his residence may not be entered, and his papers and possessions cannot be touched.  A diplomat could not be arrested or coerced if he did not comply with a court order.  She also stated that the child has inviolability as well, which can affect a Turkish court's ability to move the child pursuant to a custody order.

<u>Professor Sebnem Akipek Ocal</u>

Pliego called Sebnem Akipek Ocal, a Professor of Law at the University of Ankara in Turkey.  She teaches civil law, which includes family law, and previously served as an expert in another United States ICARA case.  Akipek Ocal testified that the custody case in 11th Family Court in Ankara is still ongoing, and that procedurally, the court is waiting on the defendant (Hayes) to reply.

Akipek Ocal stated that there is a judicial holiday in Turkey from July 20 through the beginning of September, but noted that urgent cases (including custody cases) would still move forward during that time.  Finally, she stated that the normal time for a custody case to move through the Turkish courts is approximately six months to eight months or one year, but sometimes longer or shorter.

<u>Professor Javier Diez-Hochleitner</u>

Pliego also called Professor Javier Diez-Hochleitner, a Professor of Law at the University of Madrid where he teaches public international law, including the subjects of diplomatic immunity and the Vienna Convention.  Diez-Hochleitner examined the first two Notes, and informed Pliego and his counsel that the second Note only refers expressly to the case before the 8th Family Court and not to the ongoing case before the 11th Family Court.  Diez-Hochleitner testified that he informed Pliego and his counsel that a third Verbal Note would make his immunity crystal clear.  He stated that the third Note, dated July 19th, indeed does so.

## CONCLUSIONS OF LAW

This litigation arises under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11610 (2012).  ICARA codifies the Hague Convention on the Civil Aspects of International Child Abduction. The Hague Convention was adopted by the signatory nations

"to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting the Hague Abduction Convention preamble). "[T]he Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich*, 78 F.3d 1060, 1063–64 (6th Cir. 1996) ("*Friedrich II*") (internal citations omitted).

"When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir.1993) ("*Friedrich I*") (citations omitted); *see also Friedrich II*, 78 F.3d at 1065 (noting that the merits of custody dispute are "forbidden territory" for a court adjudicating a Hague Convention petition for return of child).  Further, courts are directed to employ "the most expeditious procedures available" to adjudicate a petition seeking the return of a child under the Hague Convention and ICARA. *March v. Levine*, 249 F.3d 462, 474–75 (6th Cir. 2001) (holding that there is no requirement under the Hague Convention or ICARA that discovery be allowed or that an evidentiary hearing be conducted; "fast track" proceedings are required).

### 1.  The prima facie case

To establish a prima facie case for the return of a child, the petitioner must demonstrate by a preponderance of the evidence that: (1) the child had a "habitual residence" in a foreign country that is a signatory to the Convention; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the country of habitual residence; and (3) the

petitioner was exercising those rights at the time of the child's wrongful removal or retention. 22 U.S.C. § 9003; *McKie v. Jude*, 2011 WL 53058, at *5 (E.D. Ky. Jan. 7, 2011) (citations omitted).

In *Pliego I,* this Court determined that the child's country of habitual residence was Turkey. 2015 WL 269207 at *13. That decision was not appealed by Hayes, and neither the child's return to Turkey, nor Hayes's returning the child to the United States, alter that determination. Turkey remains the child's habitual residence. Also in *Pliego I*, this Court, relying on Turkish law, determined that Pliego had custody rights and was exercising those rights. *Id.*

The parties have stipulated that all the elements of the prima facie case have been met. Therefore, the Court will turn to the Respondent's affirmative defenses.

## 2. Affirmative defenses

Once the petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent who may assert certain affirmative defenses. *Id*. There are several affirmative defenses set out in the Convention, which must be narrowly construed. The child should not be returned if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (quoting 42 U.S.C. § 11603(e)(2)(A)). The respondent must prove this defense by clear and convincing evidence. *Jensie v. Jensie*, 2012 WL 5178168, at *1 (E.D. Ky. Oct. 18, 2012).

Hayes raised two affirmative defenses; the Court will discuss each in turn.[2]

---

[2] The parties dispute whether the grave risk of harm and intolerable situation are two separate defenses. Although the Court agrees with the Petitioner that these are not two distinguishable defenses, it will discuss each separately as laid out in the briefs.

a.    Grave risk of harm

A child should not be returned to his or her habitual residence if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (quoting 42 U.S.C. § 11603(e)(2)(A)).   The respondent must prove this defense by clear and convincing evidence. *Jensie* , 2012 WL 5178168, at *1.   "The 'grave risk' exception is to be interpreted narrowly, lest it swallow the rule." *Simcox*, 511 F.3d at 604 (internal citation omitted).   "The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence." *Freidrich II*, 78 F.3d at 1068 (6th Cir. 1996). The Court also stated:

> Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.

> *Id*.

Hayes argues that facts arising after the child was returned to his father following the July 9, 2015 hearing constitute a risk of physical and/or psychological harm to the child.   "It is the Respondent's belief that the large number of smaller new bruises which recently appeared over a period of just a few days, coupled with the one larger facial bruise and swollen eye, and the child's demeanor in trying to hide these bruises in marked contrast to his attitude towards what were concurrent, clearly normal activity bruises is worthy of attention."  (Docket No. 33).   She notes that after showing the bruises to a pediatrician, he "consistent with medical practice obligations, contacted social services."  *Id.*

Hayes attached photographs of the bruises, which show reddish marks on the child's calves and hand, a small purple/brown mark on the child's buttocks, and redness and swelling under the child's right eye. (Docket No 36-40). The Court has heard testimony on the issue of these bruises, and has examined the photographs. It finds that Pliego's testimony, as well as his mother's testimony, stating that the marks resulted from mosquito bites and scratching, to be credible. These photographs and the testimony of Hayes are simply not enough to rise to the high level of grave risk to the child required by the law.

b.    Intolerable situation

Hayes further argues that returning the child to Turkey would result in an "intolerable situation." (Docket No. 33). Article 13 of the Convention provides a defense where it is shown that return would place the child in an "intolerable situation." 42 U.S.C. § 11603(e)(2)(A)). An "intolerable situation" requires the Court to conduct a "robust evaluation of the people and circumstances awaiting in the child's habitual residence," and must constitute "more than a cursory evaluation of the [home country's] civil stability." *See Mendez Lynch*, 220 F. Supp. 2d 1347, 1364 (M.D. Fla. 2002); *In re D.D.*, 440 F. Supp. 2d 1283, 1299 (M.D. Fla. 2006). In *Mendez Lynch*, the court noted that although there was great economic and governmental turmoil in Argentina, the country would still be tolerable for the child. 220 F. Supp. 2d at 1364.

In support of her argument, Hayes points to various issues with litigating the custody dispute in Turkey. She notes that there are "still unresolved inconsistencies of what precisely has been filed and remains active in Turkish courts," (Docket No. 33), and points to Pliego's filing of a divorce and custody lawsuit in Spain as evidence of his intent to avoid litigating in Turkey. Hayes argues that she attempted to pursue the custody action in Turkey, but was prevented from doing so. She also states that there are immunity issues that have still not been resolved. For

example, she argues, and the Court heard testimony confirming, that if for example there were to be new domestic violence charges, Pliego would be immune to suit regarding them.  *Id.*  Further, she notes that Article 22 of Vienna Convention means that if child were physically taken into the Spanish Embassy, he could not be removed.  *Id.*  The Court heard testimony regarding diplomatic inviolability as laid out in the Vienna Convention, which means that a diplomat cannot be arrested or detained, his residence may not be entered, and his papers and possessions cannot be touched.

Hayes also outlines concerns about the Turkish judicial system involving "political influence at best and corruption at worst."  *Id.*  She notes that Pliego testified that the Turkish police covered up improper and "brutal" action that they took in taking the child from him at his apartment.  Hayes also alleges that there was undue influence exerted in the custody case in Ankara:  "[T]wo (2) different ministries of the Turkish government, the Ministry of Justice and the Ministry of Foreign Affairs, and the Special Prosecutor, who is the general equivalent of the United States Attorney General's office, sent letters to Respondent's Ankara 8 Court attempting to influence that Court's decision in interim matters to be in the Petitioner's favor."  *Id.*  She also notes some of the difficulties for Hayes of litigating in Turkey: 1) Hayes was the primary caregiver and that this separation will be difficult for the child; 2) a custody suit in Turkey may last a long time; 3) Pliego will leave Turkey in July of 2016 to move to his next diplomatic station; 4) and Hayes is now only eligible for a limited 90 day VISA in Turkey.  *Id.*

Hayes cites to a law review article that argues that the "intolerable situation" was intended as a flexible concept that could address many of the harder cases.  Weiner, Merle H., Intolerable Situations and Counsel for Children:  Following Switzerland's Example in Hague Abduction, 58 **Am. U. L. Rev** 335, a341-42 (Dec. 2008).  It states:

In the context of Switzerland's attempt to expand the understanding of the Article 13(b) defense, Mr. J. David McClean, a delegate for the Commonwealth Secretariat who was present at the Convention's drafting, provided background for the words "intolerable situation" in Article 13(b). He "indicated that the words 'intolerable situation' in Article 13(b) were meant to be a flexible concept that could address many of the harder cases." In particular, he explained that the phrase "intolerable situation" was added to the 1980 Convention to deal with exceptional cases where a court could not find a grave risk of harm to the child, but returning the child would have been absurd as a procedural matter.

*Id.*(internal citations omitted).

In response, Pliego argues that the majority of these issues are res judicata, as the Court addressed the issue of diplomatic immunity after litigation and a hearing in *Pliego I.* Aside from the res judicata argument, Pliego states:

In the alternative, even if Ms. Hayes' claim relating to Mr. Pliego's diplomatic immunity is not barred by res judicata (which it is), it does not rise to the level of creating an intolerable situation. First, as accurately cited by the Court in *González Pliego I*, the intolerable situation defense is relevant when "evidence that the political climate, judicial system, or conditions in Turkey would place the child in an 'intolerable situation.'" Mr. Pliego's immunity has no effect on the political climate, judicial system, or conditions in Turkey that would place the child in an intolerable situation. Generally, as set forth in *Mendez Lynch*, this specific defense is reserved for when the habitual residence is in a time of extreme turmoil, not because one of the parties had diplomatic immunity. It should be noted that the parties lived in Turkey with the child for several years prior to the first wrongful removal of the child so for Ms. Hayes to now argue that Turkey is somehow an unacceptable jurisdiction is disingenuous.

(Docket No. 34) (internal citations omitted).

The Court agrees with the Petitioner.  After hearing testimony on the issues and examining the documents (described in great detail in the Factual Findings), the Court is satisfied that Pliego has waived his diplomatic immunity such that this case will be litigated in Turkey as intended.  In particular, the Verbal Note dated July 19, 2015 specifies that Pliego has waived his immunity of both jurisdiction and execution in the 8th Family Court (where the original case was dismissed) and in the 11th Family Court (where a case is currently pending).  Professor Diez-

Hochleitner testified that the Third Note clarifies Pliego's waiver of immunity.  Professor Akipek Ocal testified that, in her opinion, the custody case is still ongoing in the 11th Family Court, where it is awaiting a response from the defendant (Hayes).  While the Court understands that there could be some charges and/or lawsuits that Pliego will remain immune from in Turkey (for example, a domestic violence charge), this is not enough to create an "intolerable situation" under the law.  Holding as such could serve to create an exception in ICARA cases for all diplomat parents, who would have the same privileges under the Vienna Convention.

Similarly, the scant evidence of the potential for corruption or undue influence in Turkey does not rise to the level required for this affirmative defense.  *See Mendez Lynch*, 220 F. Supp. 2d 1347, 1364 (M.D. Fla. 2002).  The Court already determined this issue in *Pliego I*.   "Here, Hayes did not provide evidence that the political climate, judicial system, or conditions in Turkey would place the child in an 'intolerable situation.' Thus, she has not satisfied her burden under this affirmative defense."  *Pliego v. Hayes*, 2015 WL 269207 (W.D.  Ky. Jan, 21, 2015).

Finally, the Court acknowledges that it may be difficult for Hayes to litigate the custody issue in Turkey.  She may face criminal penalties in Turkey as a result of her second abduction of the child, and may have difficulties staying in the country during a potentially lengthy custody determination.  However, these possibilities do not rise to the level of an "intolerable situation" sufficient for a successful affirmative defense.  Further, one could argue that this situation was brought about by Respondent's own actions.

Pliego has indicated his intentions and willingness to litigate the custody issue in Turkey, and to comply with all orders of the Turkish courts, and requested that the Court make certain orders to ensure both parties do so.  (Docket No. 34).  The Court understands the uniqueness and complications of a situation involving a parent in the diplomatic service.  Issues of Turkish

jurisdiction and diplomatic immunity were complicated, and required a subsequent, more detailed hearing to allow for expert opinions.  However, after reviewing all evidence in this case, the Court finds that Respondent has not satisfied her burden to prove an affirmative defense and, accordingly, the child shall be again returned to Turkey for litigation of the custody dispute.

## CONCLUSION

Accordingly, for the foregoing reasons, **IT IS HEREBY ORDERED**:

For these reasons, and consistent with the Court's conclusions above, IT IS HEREBY ORDERED that:

(1) The Petition for Return of Child pursuant to 42 U.S.C. § 11601 is **GRANTED**;

(2) This Order is for return only and it makes no substantive custody decision.  It is not to be construed by or presented to the Turkish Courts or the Spanish Embassy by any party or their representative as making any such determination in either party's favor;

(3) The Court has returned the child's travel documents to Petitioner;

(4) During the pendency of the custody action in Turkey, the child shall not be permitted to travel outside of Turkey except with permission of the Turkish court and notice to Respondent;

(5) Both parties are only to litigate custody related to the child in Turkey, and not in Spain or the United States;

(6) Petitioner shall transmit Verbal Note #225/15, dated July 19, 2015, to the 11th Family Court of Ankara, and any other Turkish court litigating this custody issue, and shall file proof of that transmission before this Court;

(7) The Court will rule separately regarding the issue of attorneys' fees.  Petitioner shall file any motion for costs and fees, along with the required supporting documentation, within fourteen (14) days from the date of this order; and

(8) A separate judgment shall enter concurrently.


IT IS SO ORDERED.